PRESNELL, District Judge,
concurring:
In light of Harris, I am compelled to concur in the panel decision. However, I think the panel opinion fails to portray the facts in the proper light. We start with the premise that officer Harrison applied deadly force to seize Beshers. The question is, was that use of force objectively reasonable under the facts and circumstances of this case? When the facts of this case are viewed, as they must be at this stage, in the light most favorable to the Appellant, I believe they demonstrate that this is a much closer case than Harris. My view of those facts, assessed in light of the appropriate standard, is as follows:

I. Background

On April 20, 2002, Officer Scott Harrison was dispatched to Bev’s Quick Stop, a convenience store in Toccoa, Georgia. A clerk at the store, believing a customer was intoxicated, had refused to sell him beer. When Harrison arrived he was told the man had put the beer down, gotten into a vehicle, and left. The clerk showed Harrison a video of the man’s truck. Harrison was not told how many people were in the truck, or whether the man who had *1269 attempted to buy the beer was the driver or a passenger.
According to Harrison, just after leaving Bev’s Quick Stop he encountered David Beshers’s pickup and watched it run a stop sign. Harrison then turned on his emergency lights, which activated his cruiser’s video recording system. After traveling a short distance down Highway 17-A, Besh-ers signaled and pulled into a shopping center parking lot. He stopped long enough to drop off a passenger, who was carrying a white plastic bag containing something about the size of a six pack, and then pulled back onto Highway 17-A. Harrison turned on his siren and followed him onto the highway. Shortly thereafter, Harrison radioed in the truck’s license plate number. Harrison testified that at this point, Beshers was wanted for nothing more significant than misdemeanor offenses.
As Beshers and Harrison proceeded down Highway 17-A, Officer John Whit-worth made a u-turn and joined the chase.[1] Officer Linda Addis, also approaching Beshers and Harrison from the opposite direction on 17-A, angled into an intersection and stopped her cruiser directly in Beshers’s path, halting perhaps 10 feet in front of him.[2] Beshers was forced to brake and swerve to avoid crashing into this roadblock.[3] This maneuver constituted the use of deadly force, long before Beshers was even allegedly suspected of having committed a felony.
After returning to the proper lane, Beshers proceeded down Highway 17-A. The video does not show Beshers driving erratically or forcing any motorists off the road. Beshers changed lanes several times, and some drivers slowed and pulled to the edge of the pavement — not off of it — presumably in response to the parade of officers with flashing lights and sirens. At the intersection of Highway 17-A and Rose Lane, Beshers came up behind a car in the right lane, which was stopped at a red light. Beshers swerved onto the right shoulder to go around the car, which was driven by Francis Lyon. As Beshers pulled alongside Lyon, she began to make a right turn, which apparently resulted in her vehicle sideswiping his truck.[4] Besh-ers then turned right onto Rose Lane.[5]
*1270 Deputy Brian Perrin of the Stephens County Sheriffs Office, who happened to be stopped on Rose Lane at the intersection, witnessed the apparent collision from a few feet away. As Harrison made the right turn onto Rose Lane in.pursuit of Beshers, he shouted “Go! Go!” out his window to encourage Perrin — a personal friend — to join the chase. Perrin contacted his agency for permission. Perrin told his agency that he saw a collision, but he did not characterize it as a felony assault. Instead, Perrin reported that the basis for the pursuit was suspicion of driving under the influence. The Stephens County Sheriffs Office only allowed pursuits in cases involving forcible felonies. Based on Per-rin’s description, his supervisor did not believe such a felony had been committed and refused to allow him to join the chase.
At a “T” intersection with Georgia Highway 145, Beshers signaled and turned left, heading south.[6] While on Highway 145, Beshers crossed the center line numerous times to pass other cars or to round curves. Each time he did so, he fully returned to the southbound lane before encountering oncoming vehicles. Again, the video does not show Beshers driving erratically or forcing other drivers off the road, although cars continued to slow and pull to the edge of the pavement as Besh-ers and the officers approached. At one point while traveling on Highway 145, Corporal Matt Ramey (“Ramey”), who was in the vehicle driven, by Addis, radioed dispatch to relay the reasons for the pursuit. He listed “reckless driving,” “leaving the scene of an accident” and “possibly, assault with a motor vehicle,” in that order.[7] Harrison subsequently testified that, at this point, he did not believe that Beshers posed an immediate threat to the safety of any officer or of the public.
A short time thereafter, Harrison passed Whitworth to become the lead pursuer. He made a number of attempts to pass Beshers, but was repeatedly forced to return to the southbound lane due to oncoming traffic or, in at least one case, limited visibility. Finally, Harrison was successful in passing Beshers. As Harrison pulled alongside and then ahead of Beshers, Beshers did not attempt to ram him or run him off the road.[8]
Harrison completed his pass of Beshers and pulled back into the southbound lane. Almost immediately thereafter, Beshers pulled across the center stripes, apparently attempting to pass Harrison in the northbound lane. Harrison immediately swerved into the northbound lane in front of Beshers and applied his brakes.[9] Besh- *1271 ers then swerved back into the southbound lane, straightening out just before his passenger-side tires touched the white line near the edge of the pavement. Harrison also swerved back into the southbound lane. As Harrison did so, his cruiser was no longer entirely ahead of Beshers’s truck, either because he had slowed or because Beshers had accelerated (or both). As a result, when Harrison swerved into the southbound lane, the right rear of his cruiser collided with the left front of Besh-ers’s truck, forcing Beshers to the right, partially off the paved surface. Harrison continued ramming the passenger side of his cruiser into the driver’s side of Besh-ers’s truck, forcing Beshers completely off the road and onto the unpaved shoulder. While doing so, Harrison moved so far over to the right that his. passenger-side tires left the pavement.
Driving on the shoulder, Beshers slowly nosed his truck ahead of Harrison’s cruiser. Despite Harrison’s efforts to force him farther off the road, the two front wheels of Beshers’s truck re-entered the paved surface.[10] Once Beshers’s front two wheels were on the pavement, Harrison hit him again in the side. This final contact caused the truck’s two rear wheels to slide to the right on the dirt shoulder. As the truck’s back end came around to the right, the truck began to roll. Beshers died in the crash that followed, approximately fifteen minutes after Harrison first began chasing him.
II. DISCUSSION
When the foregoing facts are viewed in the light most favorable to Beshers, one is forced to conclude that his conduct was not particularly heinous. Leaving aside for the moment, that he was fleeing the police, for fifteen minutes David Beshers exceeded the speed limit by up to 10 mph, illegally wove in and out of traffic, and ran some stop signs. Though such conduct is undeniably dangerous, you would be hard-pressed to find a reasonable person who felt that such activities, standing alone, warranted death. Indeed, society expects such conduct from law enforcement officers and ambulance drivers, among others, and shrugs off such conduct when engaged in for the right motive, such as to rush an injured friend to the hospital.
But Beshers engaged in this conduct while being chased by the police. Given that predicate, the law says that the fact that he did not. try to use his truck as a weapon does not matter. The fact that police were trying to apprehend him for relatively minor, nonviolent crimes does not matter. The fact that he did not actually harm anyone — aside from, perhaps, sideswiping Lyon — is of no consequence. Nor does it matter that, shortly before he began to utilize deadly force, Harrison had no subjective belief that Beshers posed a danger to himself or others.[11]
Beshers unquestionably endangered innocent bystanders while engaging in an activity that had no societal benefit. Under the Fourth Amendment balancing test applied in Harris, the “actual and. imminent threat to the lives” of the innocent posed by Beshers’ conduct outweighs the “high likelihood of serious injury or death” to Beshers posed by Harrison’s efforts to terminate the chase, because Beshers “intentionally placed himself and the public in *1272 danger by unlawfully engaging in ... reckless, high-speed flight.” Harris, 127 S.Ct. at 1778. Harris compels me to conclude that, as a matter of law, Harrison had the right to end the chase by killing Beshers — or, to utilize the language of the Harris court, Harrison’s attempt to terminate the dangerous high-speed car chase, which threatened the lives of innocent bystanders, did not violate the Fourth Amendment, even though it placed Besh-ers at serious risk of injury or death. Id. at 1779.
In this case, that could very well be the proper result. It is certainly conceivable that a jury could weigh all the evidence (rather than viewing it in the light most favorable to Beshers) and decide that Harrison’s use of deadly force was justified. A reasonable juror could reach this result, even though Beshers was suspected of comparatively minor offenses, and even though we have all witnessed hundreds of vehicles speeding, passing illegally, and running stop signs without causing an accident.
Yet this decision troubles me. Realistically, a suspect fleeing the police in a car will inevitably violate some traffic laws. By doing so, he will endanger the lives of innocent motorists (as well as the pursuing officers).[12] And that danger will always outweigh the threat posed to the suspect by the officer’s use of deadly force, because the suspect is the one who chose to put everyone else at risk by refusing to stop. In other words, the danger to the suspect is given no weight. For all of its talk of a balancing test, the Harris court has, in effect, established a per se rule: Unless the chase occurs below the speed limit on a deserted highway, the use of deadly force to end a motor vehicle pursuit is always a reasonable seizure.
As a practical matter, a police officer’s qualified immunity to use deadly force in a car chase situation is now virtually unqualified. Harris and this opinion allow a police officer to use deadly force with constitutional impunity if the fleeing suspect poses any danger to the public. In my humble opinion, I believe we will live to regret this precedent.
If a balancing test is to have any real meaning, a jury ought to be deciding whether the risk posed by the fleeing suspect is too minimal, or the suspected crime too minor, to make killing him a reasonable way to halt the chase. Nevertheless, based on my reading of Harris, that decision has been taken away from the jury where, as here, the fleeing suspect has endangered others. I therefore reluctantly concur in the result reached by the majority.

. The recording system in Whitworth’s cruiser also videotaped the chase but for an unknown reason it has no audio.

. The recording system in Addis’s cruiser had neither audio nor video, also for unknown reasons.

. The panel opinion notes that Beshers drove “into oncoming traffic,” suggesting that Besh-ers simply chose to menace other drivers. The videotape does not support such a suggestion. Addis stopped her cruiser at an angle across Beshers’s lane, with its front much closer to Beshers’s truck than its rear. Judging from the video, if Beshers had swerved to the right, away from oncoming traffic, he likely would have run into the nose of Addis's cruiser. It should also be noted that upon clearing Addis’s cruiser, Beshers promptly returned to the proper lane, and he did so without encountering any oncoming traffic.

. It is impossible to tell, from the video, whether the two vehicles collided. The Toc-coa officers subsequently claimed to have perceived this collision as an intentional assault by Beshers on Lyon. But the video clearly shows (1) Beshers pulling alongside Lyon, (2) Lyon turning right, and (3) Beshers immediately jerking the nose of his truck to the right — away from Lyon, to avoid hitting her.

. It is not clear whether Beshers had originally intended to turn right on Rose Lane or to pass Lyon on the shoulder and continue on Highway 17-A. Beshers signaled his left-hand turn into the shopping center parking lot and the subsequent left turn from Rose Lane onto Georgia Highway 145, but did not activate his turn signal as he approached Rose Lane.

. The video shows that Highway 145 — or at least the section of it on which this pursuit occurred — is a rural stretch of highway, with no sidewalks- or pedestrian traffic, and only sparse vehicle traffic. Corporal Matt Ramey, who was in the vehicle driven by Addis, testified that the area where the crash occurred was "a very unpopulated area. I mean, there's not much traffic. There's not many people. You know, we went from the middle of a municipality, in the middle of a town, out, down a two-lane road, where it becomes a little safer situation.”

. In addition to the use of the word "possibly,” Ramey's tone of voice at least arguably suggested he is not convinced any such assault occurred.

. Harrison subsequently testified that he passed Beshers to be in a better position to warn oncoming traffic and in hopes of discouraging Beshers from continuing to flee, but he did not broadcast such a statement during the pursuit.

. Although the videotape from Whitworth's vehicle is not crystal clear, watching it several times in slow motion -has convinced me that it is at least more likely than not that Harrison’s brake lights came on just before Beshers hit him from behind. In any event, the Whit-worth video does not "clearly contradict” Appellant’s contention on this point. As such, the court is required to assume that Harrison, not Beshers, initiated the first collision between them.

. It is not clear from the video whether this occurred because Beshers was trying to return to the road or because a collision with Harrison’s cruiser forced -the back end of Beshers's truck to the right, causing its nose to go left, back toward and onto the highway.

. Indeed, the pursuing officers demonstrated a willingness to use deadly force against Beshers — in the form of Addis's roadblock— long before his driving posed a significant threat to others.

. As attested by the dangerous instrumentality doctrine, the operation of a motor vehicle is inherently dangerous to others. Thus, the chase occasioned by a fleeing motorist will itself arguably create an immediate and substantial potential for harm to the traveling public.